IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 13, 2000

**STATE OF TENNESSEE v. JEFFREY COFFEY**

**Direct Appeal from the Circuit Court for Maury County**
**No. 10830    Jim T. Hamilton, Judge**

———

**No. M2000-00770-CCA-R3-CD - Filed February 23, 2001**

———

The defendant was convicted by a Maury County jury of aggravated child abuse of a child six years of age or less, a Class A felony, and was sentenced to twenty-five years in confinement, the maximum sentence for a Range I, standard offender. In this appeal as of right, the defendant presents two issues for our review: (1) whether the evidence was sufficient to support the conviction; and (2) whether the sentence was excessive. We conclude that the convicting evidence was sufficient. We further conclude that, although the trial court erred in applying enhancement factors (5) and (6), two other statutory enhancement factors were appropriately applied. Additionally, we conclude that, although the trial court erred in not applying mitigating factors (6) and (13), the defendant was appropriately sentenced. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and THOMAS T. WOODALL, JJ., joined.

Gary M. Howell, Columbia, Tennessee, for the appellant, Jeffrey Coffey.

Paul G. Summers, Attorney General and Reporter; Marvin E. Clements, Jr., Assistant Attorney General; T. Michael Bottoms, District Attorney General; and Lawrence R. Nickell, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Following a three-day trial, a Maury County jury found the defendant, Jeffrey Coffey, guilty of aggravated child abuse, a Class A felony. He was sentenced as a Range I, standard offender to twenty-five years in confinement, the maximum sentence in the applicable range. In this appeal as of right, the defendant presents the following issues for our review:

> I.   Whether the evidence was sufficient to support the conviction for
>      aggravated child abuse; and

II.  Whether the sentence was excessive.

Having reviewed the entire record, we conclude that the evidence was sufficient to support the conviction.  We further conclude that, although sentencing errors occurred, the defendant's sentence is appropriate.  Judgment of the trial court is affirmed.

## FACTS

The victim in this case is the infant son of the defendant and the defendant's then girlfriend, Jennifer Gladden.  At the time of the crime, Sunday, January 26, 1997, the three were living in a duplex apartment in Columbia, Tennessee.  That day had been a normal one for the parents, just "sitting around the house," and feeding and playing with their six-month old son.[1]  At approximately 3:30 p.m., Ms. Gladden told the defendant that she was going to run a quick errand.  The victim was in a battery-powered infant swing in his bedroom.  It was nap time, but he was not yet fully asleep and was still "fussy."  The defendant was in the living room watching TV.  When Ms. Gladden left, there was no one else in the apartment other than the defendant and the victim   Ms. Gladden was gone some ten to fifteen minutes.  When she returned, the telephone in the living room was off the hook.  The defendant came to her and told her that the victim had stopped breathing and that he was in his room.  She found her infant son in his bed, unconscious and lifeless.  She carried the victim back into the living room and called 911.  Ms. Gladden tried to follow the instructions of the 911 operator to determine if there were any life signs.  She also tried CPR but was afraid of hurting the victim and so only pushed slightly on his chest in an effort to get him to breathe again.

The defendant went outside onto the porch to watch for emergency medical personnel and lead them to the victim.  After emergency personnel arrived, the victim was transported to Maury Regional Hospital and then airlifted to Vanderbilt Pediatric Intensive Care Unit.  The victim was diagnosed as having extensive retinal hemorrhaging; a "profoundly severe" neurological injury; and a deep abdominal injury consistent with a "punch or kick to the abdomen."  The attending physician at Maury Regional Hospital noted other evidence of trauma to the victim's skin, including bruises of varying ages on his ribs, around his neck, on his face near the right eye, and on his forehead; scratches in the armpit area; and blisters consistent with burns on his rib and left thigh.  Although the victim survived his injuries, they were so extensive that his prognosis was described by his pediatric neurosurgeon as "horrible."  Ms. Gladden testified at the sentencing hearing that the victim, three years old by the time of the hearing, had to be fed liquids by tube every three hours, was unable to do anything for himself, was subject to seizures, could hear but was unable to see, was unable to speak, and could acknowledge his mother's voice and touch with vowel sounds and a smile.

The defendant testified at trial that some ten minutes after Ms. Gladden left to run her errand, he walked back to the bathroom and, on his way, looked into his son's bedroom.  He saw that the victim was slumped over in the swing, and he assumed the baby had fallen asleep.  He went into

---

[1]The victim was just days shy of seven months of age.

the bedroom and lifted his son out of the swing only to discover that he was limp and was not breathing. The defendant yelled at the baby and shook him to get him to open his eyes and breathe. He then placed the victim in his crib and, following a procedure that he had once seen on television, held the victim's ankles and pressed both legs to the infant's chest. When nothing worked to rouse the baby, he went into the living room to call for help but did not complete the call because at that point Ms. Gladden walked into the apartment. The defendant could not remember how many times he performed the leg movement or how hard he shook the infant.

## ANALYSIS

### Issue I. Sufficiency of the Evidence

In his first issue, the defendant asserts that the evidence introduced at trial was insufficient to convict him of aggravated child abuse. The defendant contends that the convicting evidence was all circumstantial and did not exclude, beyond a reasonable doubt, every other reasonable hypothesis save the guilt of the defendant. The defendant proffers the theory that the victim's brain damage was caused by an unexplained cessation of breathing, similar to what occurs in so-called "crib death" or Sudden Infant Death Syndrome ("SIDS"), and that he shook the infant only to revive him. The defendant had no definitive explanation for the abdominal injury, other than the suggestion that it might have been caused by an airplane game that the defendant played with the victim or the leg press procedure that the defendant used to try and revive the victim. In essence, the defendant argues that, although the victim was in his sole care when the injuries occurred, the evidence does not exclude natural or accidental causes rather than criminal culpability.

When an accused challenges the sufficiency of the convicting evidence, this court must review the record to determine if the evidence adduced at the trial was sufficient "to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt based on direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

Evidence that is circumstantial differs from direct evidence in that it "consists of proof of collateral facts and circumstances from which the existence of the main fact may be deduced according to reason and common experience of mankind." Bishop v. State, 287 S.W.2d 49, 50 (Tenn. 1956). Circumstantial evidence alone may be sufficient to support a conviction. See State v. Buttrey, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988) ("A criminal offense may be established exclusively by circumstantial evidence.") (citations omitted). However, if a conviction is based purely on circumstantial evidence, the evidence must "'exclude every other reasonable theory or hypothesis except that of guilt . . . [.]'" State v. Tharpe, 726 S.W.2d 896, 900 (Tenn. 1987) (quoting Pruitt v. State, 460 S.W.2d 385, 390 (Tenn. 1970)).

In determining the sufficiency of the convicting evidence, this court does not reweigh or reevaluate the evidence. See State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Nor may this court substitute its own inferences for those drawn by the trier of fact from circumstantial evidence.  See Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956).  On the contrary, upon a conviction in the trial court, this court is required to afford the State the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences that may be drawn from the evidence.  See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  The trier of fact determines the "'weight and credibility to be given to the testimony of witnesses.'"  Id. (quoting Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966)).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).  Because the guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, the accused, in choosing to challenge the sufficiency of the convicting evidence, has the burden of showing why the evidence is insufficient to support the verdict returned by the trier of fact.  See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).  This court will not disturb a guilty verdict because of the sufficiency of the evidence unless the facts contained in the record are insufficient, as a matter of law, for a rational trier of fact to find that the accused is guilty beyond a reasonable doubt.  See id.

Before an accused can be convicted of aggravated child abuse, the State must prove the following, beyond a reasonable doubt:

> **Aggravated child abuse and neglect.** — (a) A person commits the offense of aggravated child abuse and neglect who commits the offense of child abuse and neglect as defined in § 39-15-401 and:
>
> (1) The act of abuse results in serious bodily injury to the child; or
> (2) A deadly weapon is used to accomplish the act of abuse.
>
> (b) A violation of this section is a Class B felony; provided, that, if the abused child is six (6) years of age or less, the penalty is a Class A felony.

Tenn. Code Ann. § 39-15-402(a)–(b) (1997).

> **Child abuse and neglect.** — (a) Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare commits a Class A misdemeanor; provided, that if the abused child is six (6) years of age or less, the penalty is a Class D felony.

Tenn. Code Ann. § 39-15-401(a).

"Serious bodily injury" means bodily injury which involves:

>    (A) A substantial risk of death;
>    (B) Protracted unconsciousness;
>    (C) Extreme physical pain;
>    (D) Protracted or obvious disfigurement; or
>    (E) Protracted loss or substantial impairment of a function of a
>    bodily member, organ or mental faculty[.]

Tenn. Code Ann. § 39-11-106(a)(34).

In this case, the evidence of serious bodily injury is uncontroverted and requires no elaboration. The issue for the jury was to determine whether the injuries to the victim were the result of a criminal act or of natural causes and, if a criminal act, whether the defendant was the perpetrator. Over the three days of trial testimony, the jury heard from a number of medical experts concerning the nature and extent of the injuries to the victim and the likelihood that such injuries could be attributed to either natural or accidental causes.

The proof at trial was that when Ms. Gladden left the victim in the sole care of the defendant, she left a healthy, normal infant. When she returned approximately twenty minutes later, she found her child unconscious and lifeless. Dr. Claudia Andrews was the first medical doctor to see the victim on his arrival at the emergency room of Maury County Hospital on January 26, 1997. Dr. Andrews is licensed to practice medicine in Tennessee and is Board Certified in pediatrics by the American Academy of Pediatrics. She has practiced medicine in Columbia, Tennessee, for twenty-three years. Dr. Andrews testified that what she saw when the baby arrived was "a lot of evidence of trauma on the baby's skin." She testified further to the following:

>    A. The baby was unconscious and not responding. So we, of course, suspected a major head injury, too, because of the unconsciousness and the lack of respiration.
>
>    Q. Did the parents adequately explain those injuries to you?
>
>    A. They said that they - - the mother, to me, specifically, denied recent injury or fever. And the father had told me that he had been okay five minutes earlier. So there wasn't a history to explain that.

Dr. Andrews testified that the damage she saw could not be explained by the sequence of events the defendant related, that is, that he thought the baby was asleep in the swing; picked him up; noted that he was not breathing; shook him to get a response; placed him on his back in bed and raised his legs to his chest.

-5-

Dr. Wallace Neblett, III, a board certified pediatric surgeon, saw the victim after he had gone through initial testing in the emergency room at Vanderbilt University Medical Center and had subsequently been admitted to the pediatric intensive care unit. Dr. Neblett is licensed to practice medicine in Tennessee, having completed his training in 1980. Dr. Neblett testified that a CT scan showed that there was fluid in the victim's abdominal cavity. A sample of this fluid was extracted and indicated that there was inflammation and bleeding within the abdominal cavity. Dr. Neblett elected to perform exploratory surgery to determine the source of the free fluid within the abdominal cavity. What he found indicated, according to his testimony, the following:

> It indicates that there is some type of an injury to either the lymphatic blood vessels or to the intestine, itself, that had caused that. And we explored, and found adjacent that, back behind the stomach, adjacent to the pancreas, in the upper abdomen, that there was an area of hemorrhage in the retroperitoneum, which is a medical term for the backside of the abdominal cavity. So back behind the stomach, behind the liver, adjacent to the pancreas, there was an area of hemorrhage.

Because of what Dr. Neblett described as a "profoundly severe neurological injury," the victim was not able to take feedings by mouth but rather had to be fed through a tube, called a gastrostomy. Dr Neblett testified that the defendant's scenario of events on January 26 could not explain the sort of abdominal injury he saw in the victim because "it would take a very focal, deep blow to the upper abdomen to cause the injury that we found, way back in the back of the abdominal cavity, with other organs adjacent to that not involved." The injury was the "type of injury that one would sustain from a punch or a kick to the abdomen," according to Dr. Neblett.

Dr. Noel Tulipan, a board certified neurosurgeon at Vanderbilt specializing in pediatric neurosurgery, first saw the victim on January 27, 1997. Dr. Tulipan is licensed to practice medicine in Tennessee, having completed his training at Johns Hopkins University. When Dr. Tulipan saw the victim, the infant was in a coma and unresponsive to any type of testing that he could perform. Multiple tests, including a CT scan and X-rays, showed "a severe amount of swelling all throughout the entire brain." An MRI scan performed a year and a half later showed "severe permanent brain damage, throughout the entire brain." When asked by the prosecution if the injury to the victim's brain could have occurred as a result of the actions which the defendant claimed to have taken, Dr. Tulipan responded, "Absolutely not." Dr. Tulipan testified further to the following:

> Q. Was there a subarachnoid hemorrhage in this situation?

> A. Yes, sir.

> Q. What exactly is a subarachnoid hemorrhage?

A. Subarachnoid hemorrhage just means blood outside of the brain basically. And that was verified both by the CT scan and also by a spinal tap that showed bloody spinal fluid.

Q. Okay. And where would the blood come from?

A. It would come from blood vessels on the surface of the brain, basically.

Q. And what type of force would be caused to generate those - - make those blood vessels break?

A. Once again, it would have to be some kind of severe trauma. The trauma that I mentioned, like a motor vehicle accident or a malicious shaking, but not a mild fall and not a gentle shaking to awaken or stimulate a child, by any means.

Q. How about if you had a panicked parent that thought the child wasn't breathing? Would that account for it?

A. Absolutely not.

Q. Absolutely not?

A. It is only malicious shaking that no sane human being could possibly consider normal or, you know, usual stimulation of a child.

Q. And what is diffuse cerebral edema?

A. That's just a fancy term meaning swelling of the entire brain.

Q. And what causes that swelling? Once again, what you've described?

A. Yeah. It can be from a variety of things. It can be either from - - directly from the shaking - - the injury to the brain from shaking or it could be from the lack of adequate oxygen to the brain.

Q. Okay. Was there a situation here where there was lack of adequate oxygen? Anoxic encephalopathy?

A. That would be our best guess from those later scans. Yes.

Q. Okay. Would that lack of oxygen have caused these injuries?

A. Say again, please?

Q. Would the lack of oxygen have caused the subarachnoid hemorrhage?

A. No. Lack of oxygen would have caused the swelling of the brain. What we call the edema. But it wouldn't cause bleeding, per se. The bleeding would have had to be caused by some sort of shaking or other trauma.

On cross-examination, Dr. Tulipan stated that it was not possible to determine which came first, the lack of breathing or the shaking.

Dr. Robin Sinatra, a board certified pediatric ophthalmologist at Vanderbilt University Hospital, was called in to consult with other doctors treating the victim at the Pediatric Intensive Care Unit. She testified that a shaking injury from nonaccidental trauma would be the most likely cause of the extensive retinal hemorrhaging that she observed in the victim.

Dr. Joseph Gigante, an assistant professor in general pediatrics at Vanderbilt Children's Hospital who serves on a special child abuse committee at the hospital, was also called in to consult on the victim's case. Dr. Gigante, who is board certified, first saw the victim on January 27, 1997, and testified that he was called in because of the severity of the injuries to the victim and the lack of a good explanation for the injuries. Child abuse was suspected.

Dr. Gigante was asked if the injuries he observed could have occurred as a result of actions such as those described by the defendant. Dr. Gigante responded, "No. These were very severe, significant injuries . . . ." Dr. Gigante testified to the following:

Q. What type of injury would it take to produce those types of injuries?

A. I think, especially when you are looking at the head trauma and looking at the bleeding in the back of the eyes, the typical scenarios, or typical histories where we might see injuries like that are in a high-speed motor vehicle accident, or when a child had fallen from a significant height and then landed on his head.

Q. By significant height, do you mean falling from a bed, or would it have to be higher than that?

A. No. It would be much higher than a bed. I mean, it would be falling out of a window three or four stories tall.

As to the defendant's theory concerning SIDS, Dr. Gigante testified that one of the key indicators of SIDS is that an autopsy reveals "no evidence of any kind of abnormality with the child." In other words, according to Dr. Gigante, crib death babies, "typically don't have any type of abdominal trauma. They don't have any type of injuries to their head. They don't have any - - no evidence of any bleeding in the back of the eyes or the retinal hemorrhages."

During thorough cross-examination, Dr. Gigante was questioned as to the relationship between an infant's stopping breathing for no apparent reason and swelling of the brain. The theory being pressed by the defendant was that lack of oxygen was the primary cause of the neurological damage to the victim and that this lack of oxygen could have had an unknown origin as in cases of SIDS. Dr. Gigante sought to distinguish the two, SIDS and Shaken Baby Syndrome, in the following exchange on cross-examination:

A. But typically, what happens with these children is if they get shaken violently or are victims of Shaken Baby Syndrome, will lose consciousness.

As they lose consciousness and as their brain begins to swell, the blood supply to the brain gets cut off, because of the swelling that takes place in the brain.

As the blood supply gets cut off, they get the lack of oxygen. That lack of oxygen to the brain causes continued damage that takes place to the brain.

Q. Sure. And we may be talking about sort of a chicken and egg distinction, here.

But let me put it to you in the way of this hypothetical question: Let's suppose that for some unknown or unexplained reason, [the victim] stopped breathing for several minutes. Then someone, in an effort to revive him shook him and shook him violently. What, from your examination of the brain injury and the retinal hemorrhaging, and all, is inconsistent with that having occurred?

A. Again, because of what we see with kids - -we've have [sic] experience with children who've had SIDS, and have died of SIDS. We've had thousands of children who have died where that exact scenario that you've just described is taking place. And when

-9-

autopsies are done on these children, those findings - - the retinal hemorrhages and the brain swelling - - are just not seen.

Dr. Gigante noted that when a child dies in the crib, there is no brain swelling because the brain does not swell after death. Returning to this issue on redirect examination, Dr. Gigante stated the following:

> I can't see how a resuscitative effort of finding a baby who is not breathing and shaking them would cause - - could - - again, the literature would support that you don't see these types of injuries.
>
> And again, it wouldn't explain the abdominal injuries, either, as far as, you know, trying to shake the baby and trying to wake a child up and try to revive a child. And again, in combining the degree and the extent of these severe injuries, with the lack of a real good adequate explanation as to how the injuries have taken place; when you don't have a good - - when there is not a good history for this, these are injuries that we typically see in children who have been abused.

The defendant cites two unreported cases, State v. Jimmy Lee Jones, No. 01C01-9511-CR-00367, 1997 WL 59446 (Tenn. Crim. App. Feb. 12, 1997), perm. app. denied concurring in results only (Tenn. Jan. 5, 1998), and State v. Daniel D. Naughton, Sr., No. 02C01-9612-CR-00449, 1998 WL 119509 (Tenn. Crim. App. Mar. 18, 1998), perm. app. denied (Tenn. Dec. 7, 1998), in support of his position that the evidence was insufficient.

As to the opinion in Jimmy Lee Jones, the first decision upon which the defendant relies, we note that our supreme court denied the application for permission to appeal but concurred in the results only. Thus, absent certain very limited exceptions, none of which are present here, this holding has no precedential and citation value, and cannot be cited or relied upon. See Tenn. Sup. Ct. R. 4(F)(1)-(3).

In Naughton, the second case cited by the defendant, the majority opinion stated the following:

> The evidence established that the eleven week old child was in the primary care of the appellant and his wife, the child's mother. At the time of the injury, however, the appellant, by his own admission, alone was supervising the child and his two year old daughter. The appellant explained that the injury to the victim's leg resulted from the stroller tipping over. The testimony of medical experts contradicted this explanation, rather, the medical proof found that the injuries sustained resulted from a direct blow applied by a "lot of

-10-

force." The appellant also conceded that the leg injury occurred immediately preceding the initial trip to the emergency room for treatment. From these facts and circumstances, a rational jury could draw no other inference save the guilt of the appellant.

Naughton, 1998 WL 119509, at *3 (citation omitted).

Defendant here directs our attention to the dissenting opinion in Naughton, which states that the fact that "the defendant's explanation of the victim's injuries conflicted with the testimony of the doctors is not sufficient to prove his guilt beyond a reasonable doubt." Id. at *9. As the majority opinion in Naughton indicates, there was other, overwhelming circumstantial evidence pointing to the guilt of the appellant. Defendant's reliance on a sentence from the dissenting opinion is misplaced.

Here, although the evidence is solely circumstantial, that is not unusual in cases of child abuse where the victim is too young to relate the facts concerning the injuries. We reject the defendant's argument that the evidence is insufficient to convict him of aggravated child abuse. The probability that the injuries to the victim were accidental or attributable to natural causes is so remote that the truth must be, as the jury concluded, that the injuries were the result of culpable child abuse and not of natural causes and that the defendant was the perpetrator of this abuse. This issue is without merit.

### Issue II.  Excessive Length of Sentence

The defendant asserts that his sentence of twenty-five years as a Range I, standard offender, the maximum allowable by law for aggravated child abuse, is excessive. The trial court applied the following four enhancement factors, listed here by appropriate statutory number:

> (5)  The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense;
>
> (6)  The personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great;
>
> (18)  A victim, under § 39-15-402, suffered permanent impairment of either physical or mental functions as a result of the abuse inflicted; and
>
> (19)  If the lack of immediate medical treatment would have probably resulted in the death of the victim under § 39-15-402[.]

Tenn. Code Ann. § 40-35-114(5), (6), (18), (19). The trial court refused to apply any of the four mitigating factors submitted by the defendant, which included the following, listed here by appropriate statutory number:

> (3)    Substantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense:
>
> (6)    The defendant, because of youth or old age, lacked substantial judgment in committing the offense;
>
> (11)  The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct;
>
> (13)  Any other factor consistent with the purposes of this chapter.[2]

Tenn. Code Ann. § 40-35-113(3), (6), (11), (13).

The defendant does not contest the application of enhancement factors (18) and (19), but he contends that the trial court erred in applying enhancement factors (5) and (6) and in failing to address on the record all mitigating factors submitted by the defendant.

Although this court must conduct a *de novo* review when a defendant challenges the length, range, or manner of service of a sentence, the legislature has mandated a "presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. 40-35-401(d). The presumption of correctness is, however, "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles [of the 1989 Sentencing Reform Act] and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991).

In determining the appropriate range of a sentence, the trial court must consider the evidence received at trial and the sentencing hearing; the presentence report; the principles of sentencing, as well as arguments concerning sentencing alternatives; the nature and characteristics of the crime; evidence offered by both parties as to enhancement and mitigating factors; and any statement the defendant wishes to make on his own behalf. According to Tennessee Code Annotated Section 40-35-210, the trial court shall begin at the midpoint in the range when determining the sentence range for a Class A felony. If there are enhancing factors but no mitigating factors, the trial court may set

---

[2]The defendant requested that the trial court consider, as non-enumerated mitigators, the facts that he had been a loving father; had come from a structured home environment; had contributed financially to the care of his son after being placed on bond; had a good employment history; had no criminal record of any kind at the time of the crime; and had no history of either drug or alcohol abuse. Defendant argues on appeal that the trial court erred in failing to consider his steady employment record and his lack of a prior criminal record.

the sentence above the midpoint but still within the range.  <u>See</u>  Tenn. Code Ann. § 40-35-210(d). Should there be enhancement and mitigating factors, the trial court must start at the midpoint, and enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence as appropriate for the mitigating factors.  <u>See</u> <u>id.</u> § 40-35-210(e).[3]  There is no mathematical formula for weighing factors to calculate the appropriate sentence. <u>See</u> <u>State v. Boggs</u>, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996).  "Rather, the weight to be afforded an existing factor is left to the trial court's discretion so long as the court complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record."  <u>Id.</u> at 475-76 (citations omitted).

Both parties agree that the trial court appropriately applied enhancement factors (18) and (19), factors that apply specifically to victims under Tennessee Code Annotated Section 39-15-402, that is, victims of child abuse and/or neglect.  The facts of the case support the application of these statutory enhancement factors.

As to enhancement factor (6), the State concedes that the trial court improperly applied this factor. We agree.  To be applicable, enhancement factors must not be "themselves essential elements of the offense."  <u>State v. Poole</u>, 945 S.W.2d 93, 95 (Tenn. 1997).  Thus, enhancement factor (6)—that the injuries inflicted upon the victim were particularly great—is inapplicable to offenses where "serious bodily injury" is an element of the offense. <u>Id.</u> at 98.  Because "serious bodily injury" is an element of aggravated child abuse as it is defined in this case, it was error to apply it also as an enhancement factor.

As to enhancement factor (5), we initially acknowledge the fact that our supreme court has determined that proof of serious bodily injury, which is an element of especially aggravated robbery, does not necessarily establish the enhancement factor of "exceptional cruelty."  <u>Id.</u>  "In other words, the facts in a case may support a finding of 'exceptional cruelty' that 'demonstrates a culpability distinct from and appreciably greater than that incident to' the crime of especially aggravated robbery."  <u>Id.</u> (citing <u>State v. Jones</u>, 883 S.W.2d 597, 603 (Tenn. 1994)).  This court has followed the instructions of <u>Poole</u>, and determined that enhancement factor (5) may apply to the offense of aggravated child abuse. <u>See</u> <u>State v. Daniel D. Naughton, Sr.</u>, No. 02C01-9612-CR-00449, 1998 WL 119509, at *7 (Tenn. Crim. App. Mar. 18, 1998), <u>perm</u>. <u>app</u>. <u>denied</u> (Tenn. Dec. 7, 1998).  If the trial court should choose to apply factor (5), it should "state what actions of the defendant, apart from the elements of the offense, constituted 'exceptional cruelty.'" <u>State v. Goodwin</u>, 909 S.W.2d 35, 45 (Tenn. Crim. App. 1995).

_____

[3]The defendant asserts that the trial court should have started at the minimum sentence of fifteen years where the range is fifteen to twenty-five years for a Class A felony for a Range I, standard offender, rather than at the midpoint of twenty years.  Defendant argues that the offense date, January 26, 1997, supposedly predates the amendment to Tennessee Code Annotated Section 40-35-210 requiring sentencing courts to begin at the midpoint as the presumptive minimum sentence for Class A felonies.  That amendment took effect on July 1, 1995, and, therefore, it applies to the defendant.  <u>See</u> H.R. 1766, 99th Leg., 1st Reg. Sess. (Tenn. 1995).

Here, the trial court stated the following regarding the application of factor (5):

> One of the enhancing factors is whether or not this victim; this child was treated with exceptional cruelty during those 15 or 20 minutes. We have to look at the proof in this case, and the proof in this case is that when Miss Gladden left you alone with this child, we had a normal healthy, happy, child, sitting in a swing, and when she came back, some 20 minutes later, we have a child who has quit breathing, who has suffered ruptured retinas behind his eyes, causing bleeding. Who has suffered massive - - that's the way the doctor described it - - massive brain damage, causing bleeding on the outer layers of the brain. He suffered a deep abdominal bruise that was described as having to have been inflicted by a deep, hard blow to the abdominal area.

> And as a result of those injuries, we now have a child, who at that time, was some seven months old, and we now have a child that I believe is three, maybe three going on four, who is blind for life, who is fed by a tube three or four times a day, or every three or four hours in his stomach, who cannot speak, and can hear, but barely responds and doesn't respond really to anyone accept [sic] his mother.

> And this child's prognosis is that - - according to these doctors, he really doesn't have any prognosis. He's going to be this way the rest of his life. And God only knows how long he'll live. He might live to be 40, 50 years old. So I think that enhancement factors [sic] fits.

Although the trial court, in the above passage, has clearly set out those actions of the defendant that constituted aggravated child abuse, the court did not make any findings as to actions by the defendant, apart from the elements of the offense, that constituted exceptional cruelty. The court relied instead on the injuries that occurred during the twenty minutes when the victim was in the sole care of the defendant and on the long-term effects of those injuries. The defendant relies on Naughton, 1998 WL 119509 at *7, for the proposition that "exceptional cruelty" usually involves circumstances of long-term abuse or torture; or some unusual type of abuse. Although there was some testimony concerning other bruises, scratches, and possible cigarette burns, the seriousness and magnitude of those old injuries were not relied on by the trial court. We conclude that there was no

-14-

evidence in the record to support a finding of exceptional cruelty.[4]  Therefore, enhancement factor (5)[5] should not have been applied.

As to mitigating factors, factor (3)—that substantial grounds exist tending to excuse the conduct—is argued by the defendant because the State did not directly rebut his testimony that when he discovered his son was not breathing, he shook him only to revive him.  The trial court, in denying the application of factor (3), found the following:

> Your story about your efforts to revive the child by shaking it, these expert witnesses; these doctors that continue to treat your son to this day, all testify that there was no way on earth that the massive injuries this child suffered could have been caused by what you say you did.

The trial court appropriately denied the application of mitigating factor (3).

As to mitigating factor (6)—that the defendant, because of his youth, lacked substantial judgment in committing the offense—the defendant argues that he was only twenty-three at the time of the offense; that he had never been thrust into such an emergency situation before; and that he had no training in first aid or CPR.  The State argues, on the other hand, that the defendant was not a juvenile but a twenty-three-year-old father who severely abused his son and that "[t]o attribute the injuries of his own seven month old child to a youthful lapse in judgment is preposterous."  The trial court stated that "[c]ertainly your youth is something to consider."  The trial court apparently concluded that this factor existed, and, as a result, it should have been weighed in the sentencing of the defendant.  The trial court erred in not doing so.

As to mitigating factor (11)—that the defendant committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct—the defendant argues that testimony of his mother and of the victim's mother indicated that he had been a loving father who often had sole care of his son.  The defendant points to the State's theory that he had simply "snapped" because the child would not stop crying as supporting the application of factor (11).  The State points to the testimony presented indicating the presence of suspicious bruises, scratches, and burn marks on the victim.[6]  This testimony, according to the State, was evidence from which a sustained intent on the part of the defendant to violate the law by abusing

---

[4]We compare the circumstances here to those in State v. Kerwin L. Walton where a defendant, left with the care of the thirteen-month-old infant son of his girlfriend, became angry at the infant for crying continuously; punched the victim in the stomach; left the victim to suffer "the most painful injury a human body can suffer" for a period of six hours while he socialized with friends; and, finally, set the house on fire in an effort to conceal the death of the child.  No. 02C01-9610-CR-00321, 1997 WL 471169, at *1-2 (Tenn. Crim. App. Aug. 19, 1997).  We concluded that enhancement factor (5) was appropriately applied in this case.  See id. at *2.

[5]The trial court declined to apply enhancement factor (10)—that "the defendant had no hesitation about committing a crime when the risk to human life was high[.]"

[6]Photographs of these injuries were entered into the trial as evidence.

his infant son could be inferred. The State argued that the trial court should regard the photographic evidence and the testimony of doctors that these injuries were "separate and apart from those injuries for which Mr. Coffey was convicted." While not specifically addressing the evidence of past abuse, the trial court did address the issue of intent of the defendant and the circumstances of the case, including the fact that events happened so quickly on that Sunday. The trial court took particular note of the fact that in circumstances such as presented here, where the defendant was alone with an infant, motivation was simply impossible to discern or understand. We find no error in the trial court's conclusion that mitigating factor (11) should not apply.

As to factor (13), the "catch-all" factor, the defendant asserts that the trial court should have considered the facts that he had no criminal record and that he had maintained steady employment since dropping out of school after the ninth grade. The trial court did not specifically address this non-enumerated factor, and we conclude that this was error. In State v. Gutierrez, 5 S.W.3d 641, 646 (Tenn. 1999), our supreme court noted that "[t]he lack of a criminal history is appropriately considered in mitigation."

Additionally, this court has noted that "some favorable consideration" is normally given based upon "family contributions and work ethic." State v. McKnight, 900 S.W.2d 36, 55 (Tenn. Crim. App. 1994). In State v. Evay Markel Kelley, No. E1999-00557-CCA-MR3-CD, 2000 WL 224358, at *11 (Tenn. Crim. App. Feb. 28, 2000), perm. app. denied (Tenn. Nov. 20, 2000), this court noted that "relative to sentencing, an individual's past essentially stands as a witness either for or against him or her." Thus, we conclude that the defendant was entitled to have his lack of a prior criminal record and his good work record considered as mitigating factors in his sentencing.

We conclude that, although the trial court erred in applying enhancement factors (5) and (6), enhancement factors (18) and (19) were appropriately applied. Further, since the trial court apparently determined that the defendant's youth was a mitigating factor, it should have been considered in setting his sentence. Additionally, we conclude that mitigation factor (13) applied because of the defendant's lack of a prior record and good work history. Nonetheless, we conclude that the horrendous injuries to the victim so "firmly embed[ded] the sentence in the ceiling" that the sentence imposed was appropriate. State v. Samuel D. Braden, No. 01C01-9610-CC-00457, 1998 WL 85285, at *7 (Tenn. Crim. App. Feb. 18, 1998).

## CONCLUSION

For the reasons discussed herein, the judgment of conviction for aggravated child abuse is affirmed. Furthermore, we affirm the defendant's sentence of twenty-five years for this offense.

_____
ALAN E. GLENN, JUDGE